UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RYAN BRAHNEY,

                Petitioner,

        v.                                     **DECISION AND ORDER**

RAYMOND CONVENY, *Superintendent*          1:18-cv-01054 EAW
*of Elmira Correctional Facility*,

                Respondent.

## INTRODUCTION

*Pro se* petitioner Ryan Brahney ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is being unconstitutionally detained in the custody of Raymond Conveny, Superintendent of the Elmira Correctional Facility ("Respondent"). (Dkt. 1). Petitioner is incarcerated pursuant to a judgment entered against him on October 25, 2012, in the Cayuga County Court,[1] located in Auburn, New York. (*Id.* at 1). Petitioner was sentenced to an aggregate term of 54 years to life on convictions for two counts of murder in the second degree, two counts of burglary in the first degree,

---

[1]     "Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application." 28 U.S.C. § 2241(d). It is generally the practice of this Court, and the practice of other district courts in New York, to transfer habeas petitions to the district where the conviction occurred (which, in this case, is the Northern District of New York). However, given the length of time the petition has been pending in this district, the Court will not transfer the petition.

one count of criminal possession of a weapon in the fourth degree, and two counts of criminal contempt in the first degree.  (*See id.* at 1; Dkt. 8 at 3).

Petitioner contends he is being held in violation of his constitutional rights for the following reasons: (1) the imposition of consecutive sentences was illegal and a violation of his constitutional rights (ground one); (2) he was deprived a fair trial because he was not asked whether he consented to the admission of guilt on the intentional murder charge and was denied the right to testify (ground two); and (3) Petitioner was denied effective assistance of counsel when his attorney waived his right to a jury trial and admitted to the intentional murder of the victim, Bridget Bell, and later deprived him of the right to testify (ground three).  (Dkt. 1 at 6-7).  For the reasons discussed below, the Court finds that Petitioner is not entitled to federal habeas relief.

## **BACKGROUND**

### I.      **Underlying Crime**

Mark Besner, Petitioner's friend, testified that on November 19, 2011, Petitioner arrived at Besner's friend's house around midnight.  (Dkt. 8-3 at 98-100).  Upon arrival, Petitioner stated that he was coming from the house of his former girlfriend and the mother of his child, Bridget Bell, and the two had argued.  (*Id.*).  Petitioner stated that he was upset with Bell and that, "if it happen[ed] again that he was going to kill her," while making stabbing gestures with his pocketknife.  (*Id.* at 101-02).

The next day, November 20, 2011, at around 9:30 p.m., Wayne Lamb, Bell's ex-boyfriend, arrived at Bell's home.  (*Id.* at 128).  Lamb testified he had recently been released from prison and was on parole.  (*Id.* at 155-58).  He had multiple narcotics

convictions and an assault conviction. (*Id.* at 180-82). Lamb testified he previously used and sold cocaine and testified that Bell had previously used cocaine. (*Id.* at 182-83).

That same night, around 10:00 p.m., Petitioner asked his girlfriend, Kimberly David, to drive him to Bell's residence to drop off a Christmas stocking for his son. (*Id.* at 210-11). She testified that she complied with Petitioner's request and dropped him off down the street from Bell's home. (*Id.* at 212). Shortly after 10:30 p.m., Petitioner arrived at the back door of Bell's apartment. (*Id.* at 160). He knocked on the window, back door, and then went to the front door where he started yelling and making threats to kill Lamb. (*Id.* at 160-63). Bell called 911 and then went upstairs, presumably to check on her sleeping son. (*Id.* at 164). Once Petitioner saw Bell was calling 911, he left. (*Id.* at 166). According to Lamb, Bell expressed that she was fearful of Petitioner because of prior instances in which he beat her. (*Id.* at 167-68). When the police arrived at Bell's home, she explained what had happened and advised that she had a restraining order against Petitioner. (*Id.*). Soon after, Lamb and the police left Bell's home. (*Id*. at 169). Lamb then called Bell, sometime after 11:00 p.m., to make sure she was all right. (*Id.* at 170-71). Bell advised she was fine. (*Id.* at 171). When Lamb tried to call her again later that night, she did not answer the phone. (*Id.*).

Meanwhile, Petitioner called David and requested that she pick him back up near Bell's home. (*Id.* at 217). When she did, he "snickered" getting into the car and said that he was probably going back to jail for violating the restraining order Bell had against him and that there was a "drug dealer" in her apartment. (*Id.* at 221). Petitioner also stated that

he had pounded on the window and threated Lamb.  (*Id.* at 222-23).  David then dropped Petitioner off in a parking lot and did not see him again that night.  (*Id.* at 226, 228).

On November 21, 2011, around 1:00 a.m., Timmie James Blaisdell was in his home when Petitioner, his nephew, arrived covered in wet blood.  (*Id.* at 252-54).  Petitioner asked Blaisdell to call Petitioner's mother to go pick up his son.  (*Id.* at 254).  Petitioner then told Blaisdell that he had killed Bell by stabbing her, and that he could not have "drug dealers" around his son.  (*Id.* at 255-56).  Blaisdell called the police and Petitioner was arrested.  (*See id.* at 265-69).

Captain Paul Casper from the Auburn Police Department and other officers went to Bell's apartment to investigate.  (*Id.* at 340).  Captain Casper saw a smashed window, torn screen, and cinder block on the floor.  (*Id.* at 342-44).  Bell was found lying in the living room, dead, with a knife sticking out of her chest.  (*Id.*).  She had what appeared to be defensive wounds on her arms.  (*Id.* at 357).  There were bloody footprints and blood stains at the bottom of the staircase and going up the stairs.  (*See generally, id.* at 343-56).  DNA revealed that Petitioner's blood was present on the house door and the handle of the knife.  (*Id.* at 430).

Upstairs, police observed signs of a struggle.  (*Id.* at 355).  The sheets and comforter had been pulled off the bed and dragged towards the door.  (*Id.*).  There were clothes and shoes kicked all over, pieces of glass on the floor, blood on the walls upstairs, on a chair, and "all over the place."  (*Id.* at 355-57).  Petitioner and Bell's son was found upstairs still asleep in his bed.  (*Id.* at 351).

The Onondaga County Chief Medical Examiner reported Bell suffered a total of 38 stab wounds, including some inflicted after her death. (*Id.* at 396, 404). Bell died of the various stab wounds, which penetrated her neck, chest, and back. (*Id.* at 407).

After his arrest and while in custody, Petitioner made numerous admissions of guilt to surrounding officers. For example, when the officers gave him a blanket after he had requested one on multiple occasions, Petitioner responded, "make me miserable because I killed a miserable bitch. Makes no sense." (*Id.* at 332-33). When asked by officers what happened to his injured hands, Petitioner stated that he cut his hands while stabbing Bell, explaining that his hand slipped off the handle of the butcher knife and down the blade. (*Id.* at 365, 368, 380). Petitioner was also asked by officers if he had anything to look forward to in the future, to which he replied, "Yes. Twenty-five to life for killing that fucking bitch." Petitioner added, "I'll do every day of it. It was worth it." (*Id.* at 369, 389). Petitioner told Officer Massi that, "he knew what he did and he did it. And he did it because [Bell] was a whore bringing drug dealers and drugs around his son."[2] (*Id.* at 380).

## II.   Pretrial and Trial Proceedings

On October 1, 2012, after being indicted for the murder of Bell and other crimes, Petitioner indicated he wished to waive his right to a trial by jury and proceed by way of bench trial. (Dkt. 8-3 at 34-35). Prior to entering a stipulation on the matter, the trial judge asked Petitioner a series of questions to ensure he fully understood the nature of his

---

[2]    Petitioner also admitted to Bell's murder to his mother on the phone on November 22, 2011. Specifically, he told her that he dragged Bell down the stairs and murdered her. (*See* Dkt. 8-3 at 441).

decision.  The judge walked Petitioner through the differences between a jury trial and a bench trial—making clear a jury verdict required 12 unanimous votes, whereas a bench trial verdict was the decision of the judge alone—and ensured that the decision to proceed with a bench trial was that of Petitioner's and not a result of promise or influence.  (*See id.* at 35-39).  Petitioner then signed a stipulation waiving his right to a jury trial.  (*Id.* at 39-41).

Before opening statements, the trial court entered another stipulation, which Petitioner and his counsel had orally agreed to and signed, which provided that Petitioner, "acting alone caused the death of Bridget Bell on November 21, 2011 in the early morning hours by stabbing her with a knife in her home at 115 Olympia Terrace in the city of Auburn." (*Id.* at 47).  The trial court also entered various stipulations regarding the chain of custody for each item of evidence, foundations for photographs, and other evidentiary concerns.  (*See id.* at 47-52).  Counsel agreed to delay holding a *Molineaux* or *Sandoval* hearing until it became apparent such a hearing was necessary.  (*Id.* at 59-60).

In the afternoon of October 1, 2012, the bench trial commenced before Cayuga County Court Judge Thomas G. Leone.  (*Id.* at 28).  After the State presented its case, the Petitioner presented his, asserting an extreme emotional disturbance defense, supported by testimony of his mother concerning his childhood and anger issues, his past behavior, and his relationship with Bell.  (*See generally*, *id.* at 449-76).  The defense also presented an expert in psychology who examined Petitioner and his mental state and testified to such. (*See generally*, *id.* at 525-42).

Following the trial, the judge returned a verdict of guilty on all counts—two counts of murder in the second degree (Counts One and Two), two counts of burglary in the first degree (Counts Three and Four), criminal possession of a weapon in the fourth degree (Count Five), and two counts of criminal contempt in the first degree (Counts Six and Seven). (*Id.* at 689-90). On October 25, 2012, Petitioner, who waived his appearance at his sentencing (*id.* at 699), was sentenced to 25 years to life on both Counts One and Two, to run concurrently, 25 years on both Counts Three and Four, to run concurrently with each other but consecutive to Counts One and Two, one year on Count Five to run concurrently with all sentences, two to four years on Count Six to run consecutive to Counts One through Four, and two to four years on Count Seven to run consecutive to Counts One through Three and Six, and concurrent to Count Four. (*Id.* at 724-25).

## III.   Direct Appeal

Petitioner appealed from the judgment, arguing: (1) that the court erred in sentencing him to consecutive sentences for the burglary and murder; (2) the court never conducted the *Huntley* hearing as granted by the trial court; (3) he was punished for exercising his constitutional right to trial; (4) the sentence was unduly harsh and severe; and (5) the verdict was against the weight of the evidence. (Dkt. 8-2 at 13-18). Petitioner also submitted a *pro se* supplemental brief, arguing: (1) his right to Due Process was violated because he did not knowingly concede guilt to the intentional murder of the decedent when stipulating to causing her death in an effort to assert an emotional disturbance defense; (2) his right to be present at trial was violated when he was excluded from side bars; (3) his right to testify was denied; and (4) he was denied effective assistance

of counsel on each of those same bases. (*Id.* at 28-52). On March 20, 2015, the Appellate Division, Fourth Department, affirmed the judgment with two judges dissenting on the basis that the consecutive sentence was imposed illegally. *See generally People v. Brahney*, 126 A.D.3d 1286 (4th Dep't 2015) ("*Brahney* I").

Petitioner appealed to the Court of Appeals (Dkt. 8-2 at 378), arguing that the consecutive sentences were imposed illegally (*id.* at 361-70). Petitioner also submitted a *pro se* supplemental brief, asserting the same lack of due process and ineffective assistance of counsel claims as were raised before the Fourth Department. (*Id.* at 580-97). The Court of Appeals affirmed the decision of the Fourth Department, holding it could not find as a matter of law that the burglary and murder constituted a single act for consecutive sentencing purposes. *See People v. Brahney*, 29 N.Y.3d 10, 16 (2017) ("*Brahney* II"). The court also determined that Petitioner's ineffective assistance of counsel claims were without merit and the remaining claim was not preserved for appeal. *Id.* at 354.

## IV.   Habeas Petition

On September 24, 2018, Petitioner, proceeding *pro se*, filed the instant Petition for Writ of Habeas Corpus asserting: (1) the imposition of consecutive sentences was illegal and a violation of his constitutional rights (ground one); (2) he was deprived of a fair trial by not being asked whether he consented to the admission of guilt on the intentional murder charge and was deprived the right to testify (ground two); and (3) he was denied effective assistance of counsel when his attorney waived his right to a jury trial, admitted to the intentional murder of Bell, and deprived him of the right to testify (ground three). (Dkt. 1 at 6-7). Petitioner also filed a motion for leave to proceed *in forma pauperis*. (Dkt. 2).

On November 13, 2018, the Court granted Petitioner's motion to proceed *in forma pauperis*. (Dkt. 3). The Court also set a scheduling order for Respondent to answer the petition. (*Id.*). On February 7, 2019, Respondent filed a Motion for Extension of Time to File an Answer to the petition (Dkt. 4), which the Court granted on February 8, 2019 (Dkt. 5). On April 12, 2019, Respondent again filed a motion for an Extension of Time to Answer. (Dkt. 6). That same day, the Court granted the motion and advised no further extensions would be granted. (Dkt. 7). On June 14, 2019, Respondent filed an answer to the petition and a memorandum of law in support. (Dkt. 8). On September 12, 2019, Petitioner filed his reply in response to Respondent's answer. (Dkt. 11).[3]

---

[3]     On December 11, 2020, Petitioner sent a one-page letter addressed to the Clerk of Court asking for "advice". (Dkt. 13). In the letter, Petitioner explained that a law clerk at the prison library had prepared his papers, and he recently discovered that "two critical issues" were left out of his petition. (*Id.*). He requested the Court's rules and procedures for amending his petition or, if it was too late to amend his petition, to withdraw and re-file it at a later date. (*Id.*).

To the extent this letter constitutes a formal request to amend or withdraw, the request is denied. Petitioner's letter, which does not identify or discuss the "two critical issues" allegedly not included in his petition, was filed more than two years after he filed his petition in September 2018. Petitioner does not offer any explanation as to why he did not discover that the brief was missing two arguments until December 2020, well after briefing was complete on the petition. Further, the letter request does not comport with this Court's Local Rules of Civil Procedure, which require that such requests be filed as a formal motion. *See* L. R. Civ. P. 7(a)(1) (requiring a notice of motion for all motions); *see also Chunn v. Amtrak*, No. 14 Civ. 6140(PAC) (HBP), 2017 WL 9538164, at *10 (S.D.N.Y. May 11, 2017) (denying leave to amend because plaintiff's motion was procedurally improper, including that it was not accompanied by a notice of motion), *adopted*, 2017 WL 4342142 (S.D.N.Y. Sept. 29, 2017), *aff'd*, 916 F.3d 204 (2d Cir. 2019).

**DISCUSSION**

## I.      Standard

"Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (quotation omitted). "The question is 'not whether the state court was incorrect or erroneous in rejecting petitioner's claim, but whether it was objectively unreasonable in doing so.'"  *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 367 (E.D.N.Y. 2013) (quoting *Ryan v. Miller*, 303 F.3d 231, 245 (2d Cir. 2002)).  "The petition may be granted only if 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'"  *Id.* (alteration in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

## II.     Petitioner's Claim that his Consecutive Sentences Were Illegal

Petitioner's first argument is that he is entitled to federal habeas relief because his convictions for two counts of second-degree murder and two counts of burglary should be served concurrently rather than consecutively.  (*See* Dkt. 1 at 6).  Respondent contends that this claim is not cognizable on federal habeas review.  (*See* Dkt 8 at 19).

Under N.Y. Penal Law § 70.25, sentences may be imposed consecutively where the crimes committed involved separate and distinct acts.  Here, Petitioner was found guilty of two counts of murder in the second degree, two counts of burglary in the first degree,

criminal possession of a weapon in the fourth degree, and two counts of criminal contempt in the first degree.  (*See* Dkt. 8-2 at 12).  He was sentenced, in pertinent part, to 25 years to life on each murder count to run concurrent with each other and 25 years on each burglary count to run concurrent with each other but consecutive to the counts of murder.  (*Id.*).

Petitioner appealed the legality of the consecutive murder and burglary sentences to the New York Supreme Court Appellate Division, Fourth Department, on the basis that the burglary and murder crimes involved one act rather than two separate and distinct acts, and therefore the sentences should be concurrently served.  (*See id.* at 13-14).  The court determined that the evidence supported the finding that the acts by Petitioner were "separate and distinct" and therefore, the burglary and murder were separate offenses eligible for consecutive sentences.  *Brahney* I, 126 A.D.3d at 1289 (explaining that "[a]lthough the actus reus elements of the burglary counts and the murder count overlap under the facts presented here," the People established the legality of consecutive sentencing, and citing to the evidence that "after defendant entered the apartment through a window that he smashed with a cinder block, he dragged the victim from her bed and down the stairs to the living room, where he killed her").  Petitioner again appealed the legality of the sentences to the New York Court of Appeals.  (*See* Dkt. 8-2 at 361-70).  The Court of Appeals found that it could not say, as a matter of law, that "the conduct resulting in defendant's conviction of intentional murder and the conduct underlying the elements of the burglary convictions was a single act for consecutive sentencing purposes."  *Brahney* II, 29 N.Y.3d at 16.  Therefore, the legality of the sentences was again affirmed.  *Id.*

Petitioner again claims here that the imposition of consecutive sentences was illegal. However, it is well established that "[w]hether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review." *Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012) (citing *Reyes v. New York*, No. 08 Civ 8654, 2009 WL 1066938, at *2 (S.D.N.Y. Apr. 21, 2009)); *see also United States v. McLean*, 287 F.3d 127, 136-37 (2d Cir. 2002) (finding no constitutional right to concurrent, rather than consecutive, sentences); *Heath v. Hoke*, No. CIV-88-770E, 1989 WL 153759, at *3 (W.D.N.Y. Dec. 7, 1989) ("[A] state court's interpretation of state law on concurrent and consecutive sentences is not a question of federal constitutional dimension cognizable in a federal habeas corpus proceeding."); 28 U.S.C. § 2254(a) (federal courts can grant habeas relief only when the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States"). On this basis alone, Petitioner's claim should be denied.

Nevertheless, Petitioner claims the imposition of consecutive sentences was a violation of his right to Due Process and imposed an improper "enhanced punishment." (*See* Dkt. 11 at 9-10). The Court will construe Petitioner's claim as asserting a violation of the prohibition against cruel and unusual punishment under the Eighth Amendment. Consecutive sentences are only found to run afoul to the constitutional protection against cruel and unusual punishment in "extraordinary circumstances." *Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001). Petitioner does not dispute that the trial court had the discretion to sentence him to consecutive terms pursuant to N.Y. Penal Law § 70.25, nor does Petitioner dispute that the sentences were within the range prescribed by New York

law.  Thus, the only way to properly provide a ground for habeas review under the Eighth Amendment is to demonstrate that the sentence was an improper, "arbitrary or capricious abuse of discretion."  *Jones v. Hollins*, 884 F. Supp. 758, 762 (W.D.N.Y. 1995), *aff'd*, 89 F.3d 826 (2d Cir. 1995).

The record shows that this is simply not the case.  Rather, there is specific evidence in the record supporting the finding that the burglary and murder were separate and distinct acts allowing for the imposition of consecutive sentences.  For example, there was evidence of "a small amount of blood upstairs, as compared with the large amount downstairs," demonstrating the two separate acts: a burglary at the entry upstairs, and the subsequent murder downstairs.  *See Brahney* II, 29 N.Y.3d at 16.  There was also Petitioner's statement that he "'dragged her down the stairs and murdered her,'" suggesting that Bell was alive upstairs where the burglary took place.  *Id.*  This evidence demonstrates that the imposition of consecutive sentences was not arbitrary or capricious, but rather was grounded in the evidence of record.  *See Herrera*, 171 F. Supp. 2d at 151 (petitioner's record, heinous nature of crime, and lack of remorse was sufficient to support the trial court's decision to impose consecutive sentences and therefore there was no ground for habeas review); *see also* Dkt. 8-3 at 723 (sentencing judge, in rendering Petitioner's sentence, noting that Petitioner "show[ed] no remorse whatsoever, none whatsoever").

Because consecutive and concurrent sentencing is purely a matter of state law and Petitioner cannot show a violation of his federal constitutional rights, the claim is not sufficient for habeas review.  Accordingly, Petitioner's sentencing claim is denied.

- 13 -

III.   **Petitioner's Claim that he was Denied a Fair Trial and Due Process**

Petitioner also claims that he is entitled to habeas relief on the basis that he was deprived of the right to a fair trial because the trial court failed to ascertain whether he "consented to his lawyer admitting his guilt to intentional murder," and whether he was deprived of the right to testify in his defense.  (*See* Dkt. 1 at 7).  Respondent asserts that this claim is barred because it is unexhausted, and because the Court of Appeals' determination that the claim was not preserved for appeal is an adequate state ground to preclude federal review.  (*See* Dkt. 8 at 25-26).  For the reasons set forth below, this claim is denied.

First, Petitioner asserts he was deprived a fair trial because the court did not determine whether he consented to his attorney's admission of guilt to the intentional murder of Ms. Bell.  Petitioner's assertion is not supported by the record.  Indeed, prior to trial Petitioner signed a stipulation which stated, in paragraph one, that Petitioner, "acting alone, caused the death of [Bridget Bell] on November 21st, 2011, in the early morning hours, by stabbing her with a knife[.]"  (Dkt. 8-2 at 405-06; *see also* Dkt. 8-3 at 47).  The paragraph was read on the record, with Petitioner present, and there was no disagreement from Petitioner or from his attorney.  (*See* Dkt. 8-3 at 47).  Rather, Petitioner's attorney affirmatively consented to the entry of the stipulation.  (*See id.*).  With such a clear statement made in Petitioner's presence and the express written stipulation which Petitioner signed, Petitioner cannot now claim that there was insufficient questioning regarding whether he consented to the admission of guilt to the intentional murder.  *See also Brahney I*, 126 A.D.3d at 1290 ("The record establishes that defendant's consent to the stipulation,

which he signed and which was reviewed on the record, was knowing and voluntary."). Therefore, this claim is denied.

Petitioner also claims that he was deprived of a fair trial because the trial court did not determine whether he was being denied the right to testify on his own behalf. The Second Circuit has made clear that the burden of ensuring a defendant "is informed of the nature and existence of the right to testify rests upon defense counsel," and any claim that defendant was not informed of this right or was overruled in deciding to testify must be reviewed under *Strickland v. Washington*, 466 U.S. 668 (1984)—the two-prong test for ineffective counsel. *See also Campos v. United States*, 930 F. Supp. 787, 792 (E.D.N.Y. 1996) ("[B]ecause it is primarily the responsibility of defense counsel to advise the defendant of his right to testify and thereby to ensure that the right is protected, . . . the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel.") (citation omitted). Thus, for the reasons set forth *infra* Section IV.B., this claim is also denied.

## IV.   Petitioner's Claim that He Received Ineffective Assistance of Counsel

Petitioner argues that he was denied effective assistance of counsel because his attorney "never communicated" to him that he was going to admit to the intentional murder of Bell and for failing to "speak up" on his behalf when Petitioner stated, "I should have gotten on the stand like I wanted to." (Dkt. 1 at 7, 14). The Fourth Department rejected Petitioner's contention that he was denied effective assistance of counsel and found that he was "afforded meaningful representation." *Brahney* I, 126 A.D.3d at 1290. The Court of Appeals likewise found Petitioner's ineffective assistance of counsel claims were without

merit.  *Brahney* II, 29 N.Y.3d at 16-17 ("Defendant's argument that he received the ineffective assistance of counsel has been considered and found to be lacking in merit."). For the reasons that follow, this Court agrees and denies the petition as to this claim.

"The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). "Pursuant to the well-known two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner alleging ineffective assistance of counsel 'must demonstrate (1) that his counsel's performance fell below what could be expected of a reasonably competent practitioner; and (2) that he was prejudiced by that substandard performance.'" *Woodard v. Chappius*, 631 F. App'x 65, 66 (2d Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 241 (2009)). A court need not address both components of the *Strickland* inquiry if a petitioner makes an insufficient showing on one. *Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018) ("[T]he object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (citation omitted)), *cert. denied*, 139 S. Ct. 1608 (2019).

Moreover, where a state court has rejected the ineffective assistance of counsel claim, a "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt" applies on federal habeas review. *Burt v. Titlow*, 571 U.S. 12, 15 (2013). "[T]he burden to show that counsel's performance was deficient rests squarely on the defendant . . . [T]he absence of evidence cannot overcome the strong

presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt*, 571 U.S. at 22-23 (quotations and original alterations omitted).

### A. Counsel's Failure to Communicate to Petitioner He Would be Admitting Guilt to the Intentional Murder in Furtherance of an Extreme Emotional Disturbance Defense.

Petitioner argues that his trial counsel was ineffective for admitting that Petitioner intentionally murdered Bell in furtherance of the extreme emotional disturbance defense.

To establish *Stickland* prejudice, Petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  A petitioner "must show that he was deprived of a fair trial, a trial whose result is reliable."  *Garner*, 908 F.3d at 862 (quotations and original alterations omitted).   "The prejudice inquiry is therefore ineluctably tied to the strength of the prosecution's evidence."  *Id.*   "[A] verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than 'a verdict or conclusion only weakly supported by the record.'"  *Id.* (quoting *Gen. Waiters v. Lee*, 857 F.3d 466, 480 (2d Cir. 2017)).  "As a result, '[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt.'"  *Id.* (quoting *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001)).

The waiver of a jury trial and admission of guilt to the intentional murder of Bell in furtherance of an extreme emotional disturbance defense was not egregious or prejudicial in light of the overwhelming evidence against Petitioner.  Petitioner had a violent history

- 17 -

and had previously assaulted the victim by breaking her jaw.  (Dkt. 8 at 5; *see also* Dkt. 8-3 at 120).  At trial, a witness testified that Petitioner had previously stated he was going to kill Bell while making stabbing motions with a pocketknife.  (Dkt. 8-3 at 101-02).  After her death, Petitioner admitted to various officers and to family members that he had killed Bell and indicated that he understood what he had done.  (*See, e.g.*, *id.* at 255-56, 369).  For example, at the police station, Petitioner stated to officers that "it was worth it" and that "he knew what he did and he did it.  And he did it because she was a whore bringing drug dealers around his son."  (*Id.* at 369, 380, 389).  Petitioner also acknowledged that he would spend time in prison for his behavior, specifically recognizing the severity of his conduct by noting he would likely spend "25 years" in prison.  (*Id.* at 369, 389).  The police who investigated the crime scene found blood "all over the place" including on the walls, chairs, and up the staircase.  (*Id.* at 355-58).  The victim was found lying on the living room floor with a knife in her chest.  (*Id.* at 354).  Importantly, the knife's handle, and other areas of the crime scene, contained Petitioner's DNA.  (*Id.* at 430).

Considering the overwhelming evidence supporting Petitioner's conviction, it was strategic for counsel to suggest that Petitioner stipulate to the murder of Bell and attempt to establish an extreme emotional disturbance defense in hope of reducing the conviction to first-degree manslaughter.  *See* N.Y. Penal Law § 125.20(2).  While Petitioner contends that he was not informed that he would be admitting to the intentional murder of the victim by entering the stipulation, the record from the trial court proceedings indicates otherwise.  Indeed, prior to the start of trial, Petitioner signed a stipulation expressly indicating that he caused the death of Bell.  (Dkt. 8-3 at 47).  Specifically, the stipulation stated that

Petitioner, "acting alone caused the death of Bridget Bell on November 21, 2011 in the early morning hours by stabbing her with a knife in her home[.]" (*Id.*).  Petitioner's counsel stated, "[w]e so stipulate" and the stipulation was signed by both counsel and Petitioner. (*Id.*; *see also* Dkt. 8-2 at 405-06).  Thus, this evidence does not support Petitioner's claim that counsel failed to communicate that he would be admitting to the intentional murder of Bell.[4]

Even if the evidence supported Petitioner's claim that he did not know he would be admitting to the intentional murder of Bell, the otherwise overwhelming evidence supporting his conviction bars Petitioner from meeting the second prong of the *Strickland* test, as he cannot prove that, but for counsel's failure to communicate to him that his guilt would be admitted, the result of the trial would have been different.  Indeed, a stipulation should not be deemed prejudicial where there is overwhelming evidence to support the information set forth in the stipulation.  *See United States v. Guang*, 511 F.3d 110, 120 (2d Cir. 2007); *see also United States v. Rabi*, No. 3 Cr. 082 (MGC), 2004 WL 2060804, at *3 (S.D.N.Y. Sept. 14, 2004) (no ineffective assistance of counsel where counsel allegedly agreed to stipulations which constituted admissions of guilt, as petitioner's allegation was conclusory and the government had presented overwhelming evidence of his guilt).  Here,

---

[4]    Petitioner also briefly asserts that he received ineffective assistance of counsel because he was advised by his attorney to waive a jury trial and pursue a bench trial. (Dkt. 1 at 7).  This claim also has no merit.  The trial court discussed in detail with Petitioner the differences between a bench trial and a jury trial and confirmed with Petitioner that it was his decision to proceed with a bench trial and not that of counsel or any other influence. (*See* Dkt. 8-3 at 34-38).  To the extent Petitioner asserts this as its own separate claim, it is denied.

there is no question that even without a stipulation, there was overwhelming evidence from which a jury or a judge in a bench trial could conclude that Petitioner intentionally killed Bell.  If Petitioner had declined to enter the stipulation, it is virtually certain that the evidence, including Petitioner's multiple admissions that he murdered Bell and the circumstances surrounding that night, would have established that he intentionally killed Bell.  In fact, at no point does Petitioner deny his intent to kill Bell or claim that his knowledge of the plan to admit to the intentional killing of Bell would have changed the ultimate result of the case.

Accordingly, since Petitioner has failed to demonstrate that he lacked knowledge that the extreme emotional disturbance defense required admitting guilt to the intentional murder of Bell, and because he cannot establish any legitimate prejudice, this claim is without merit and is denied.

### B. Counsel's Failure to Have Petitioner Testify After Indicating a Desire to Testify.

Petitioner also contends that his counsel was ineffective for failing to speak up on his behalf when he suggested he wanted to testify.  (Dkt. 1 at 14).

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  "[T]he decision whether to testify belongs to the defendant and may not be made for him by defense counsel."  *Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997).  "Although counsel . . . may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must

abide by the defendant's decision on this matter." *Id.* at 79.  "[A]ny claim by the defendant that defense counsel has not discharged this responsibility—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in [*Strickland*], for assessing whether counsel has rendered constitutionally ineffective assistance." *Id.*; *see also Nappy v. United States*, Nos. 13 CV 5888(CM), 94 CR 656, 2014 WL 6792001, at *10 (S.D.N.Y. Nov. 21, 2014) ("A defendant's claim of denial of the right to testify is reviewed in the same manner as an ineffective assistance of counsel claim.").

Petitioner claims that his counsel advised him against testifying because he "has a short fuse and [counsel] worried that the prosecutor may exploit that anger and cause the [P]etitioner to snap and become verbally abusive which would greatly upset the judge and work against the [P]etitioner."  (Dkt. 1 at 15).  The record reflects that at the end of trial, Petitioner stood up and said, "I should have gotten on the stand like I wanted to."  (Dkt. 8-3 at 684).  As the Appellate Division found, such a statement made clear that Petitioner knew he had a right to testify. *Brahney* I, 126 A.D.3d at 1290.  What is less clear is whether Petitioner knew that the ultimate decision of whether to testify belonged to him, rather than to his attorney. *See Campos*, 930 F. Supp. at 793 ("[T]he issue here is not whether petitioner knew he had the right to testify, but whether he knew that ultimately it was his choice to make, not that of his attorney.").  Regardless, even if Petitioner has raised an issue on the first prong of *Strickland*, his claim fails on the second. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  "As the Second Circuit has stated in the right-to-testify context, any probability of an acquittal . . . must be based on an assessment that, if [petitioner] had testified, the jury would have credited his testimony, notwithstanding the substantial evidence against him." *Errington v. Warden Bedford Hills C.F.*, 1:17-CV-00258 EAW, 2019 WL 3556683, at *9 (W.D.N.Y. Aug. 5, 2019) (alterations in original) (internal quotations and citations omitted), *aff'd*, 806 F. App'x 76 (2d Cir. 2020).

Petitioner claims that, if given the opportunity to testify, he would have told "his side of what actually transpired when he broke a window and entered the victim's apartment." (Dkt. 1 at 15).  Even if Petitioner did provide his version of events, there is no reasonable probability that the court would have found in favor of the extreme emotional disturbance defense.  As Petitioner acknowledges in his petition, "every prosecution witness testified that the petitioner killed the victim in a rage because he was upset that [Bell] had their 3 year old son around drugs and drug dealers." (*Id.* at 14).  Petitioner also pointed out that his mother testified to his anger issues, and two expert witnesses testified to his mental state as it pertained to the extreme emotional disturbance defense.  (*Id.* at 14-15).  In Petitioner's words, the evidence available on the extreme emotional disturbance defense was "overwhelming." (*Id.* at 15).  Thus, there is no reasonable probability that Petitioner's own "version of events" would have tipped the scales in his favor, in light of

the substantial evidence already before the trial court establishing Petitioner's emotional state before and after the murder.  Accordingly, habeas relief is not warranted on this basis.

**CONCLUSION**

For the foregoing reasons, the Court denies the Petition for Writ of Habeas Corpus (Dkt. 1).  The Clerk of Court is instructed to close this case.  Further, because Petitioner has not made a "substantial showing of the denial of a constitutional right," *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:       April 30, 2021
             Rochester, New York